JACOB H. ZAMANSKY (*pro hac vice* application forthcoming)
  jake@zamansky.com
SAMUEL E. BONDEROFF (*pro hac vice* application forthcoming)
  samuel@zamansky.com
EDWARD H. GLENN, JR. (*pro hac vice* application forthcoming)
  eglenn@zamansky.com
JUSTIN SAUERWALD (*pro hac vice* application forthcoming)
  justin@zamansky.com
ZAMANSKY LLC
50 Broadway, 32nd Floor
New York, NY  10004
Telephone:   (212) 742-1414
Facsimile:    (212) 742-1177

*Attorneys for Plaintiff*
JACK XIE, individually and as
representative of a class of similarly
situated plan participants, on behalf of
the ALLERGAN INC. SAVINGS AND
INVESTMENT PLAN and ACTAVIS
INC. 401(k) PLAN [1]

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| JACK XIE, and all other individuals similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>THE INVESTMENT COMMITTEE and BENEFITS OVERSIGHT COMMITTEE of the ALLERGAN INC. SAVINGS AND INVESTMENT PLAN and ACTAVIS INC. 401(k) PLAN, and MARIA TERESA HILADO,<br><br>Defendants. | Case No.: 8:17-CV-00271<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYMENT RETIREMENT SECURITY ACT**<br><br><u>JURY TRIAL DEMANDED</u> |

---

[1]   Additional counsel listed on signature page.

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYMENT RETIREMENT SECURITY ACT

Plaintiff Jack Xie ("Plaintiff"), by and through his attorneys, files this Complaint on behalf of himself and other similarly situated current and former Allergan plc ("Allergan" or the "Company") or its predecessor companies, who were participants in and beneficiaries of the Allergan Inc. Savings and Investment Plan and the Actavis  Inc. 401(k) Plan (together, the "Plan") and who were invested in the Company stock during the period of March 17, 2015, through November 3, 2016, inclusive (the "Class Period"). Plaintiff alleges the following based on the investigation of his counsel, which included a review of the Plan's governing documents; the Plan's public reports filed with the United States Securities and Exchange Commission ("SEC") and U.S. Department of Labor; discussions with Plan participants; other SEC filings by Allergan; other lawsuits against Allergan; press releases and other public statements issued by Allergan; and media reports about Allergan.  Plaintiff believes that substantial additional evidentiary support exists and will emerge for the allegations set forth herein after there has been a reasonable opportunity for discovery.

1.     This is a class action brought pursuant to Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, by participants in the Plan, and on behalf of the Plan, to recover many millions of dollars of damage suffered in their retirement accounts due to breaches of fiduciary duties owed to them.

2.     Defendants are:   Allergan's corporate officers who comprise the Investment Committee ("Investment Committee"), which was the fiduciary of the Plan directly responsible for ensuring the prudence of all investment options available under the Plan, including Allergan stock; and, Allergan's corporate officers on the Benefits Oversight Committee ("Benefits Committee"), who were the fiduciaries responsible for appointing and monitoring the Investment Committee.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYMENT RETIREMENT SECURITY ACT

3.      The Plan is a defined contribution plan under ERISA sponsored by Allergan for eligible employees to contribute a portion of their income towards their retirement savings.   Among the investment options available to Plan participants is an employee stock option plan ("ESOP"), which allows Plan participants to buy and own shares of Allergan stock through the Plan.  During the Class Period, Allergan stock was the largest single investment purchased and held under the Plan by Plan participants.

4.      Defendants' breaches of fiduciary duty occurred when they knew or should have known that Allergan's stock had become artificially inflated by the Company's fraud and misrepresentation, thus making Allergan stock an imprudent investment under ERISA and damaging the Plan and those Plan participants who bought or held Allergan stock.

5.      Allergan (formerly known as Actavis plc) is a specialty pharmaceutical company that develops, manufactures, markets, and distributes medical aesthetics, biosimilar, and over-the-counter pharmaceutical products.  It operates and conducts business in the United States and its securities trade on the New York Stock Exchange under the ticker symbol "AGN."

6.      Allergan issued public statements in its annual Form 10-K and quarterly Form 10-Q reports that were materially false and misleading.  The Company falsely credited its financial results to the success of its strategic marketing, effective competition and diligent sales.  In truth, the Company's results were due to anti-competitive and possibly illegal, collusive price fixing that has drawn investigation by the U.S. Department of Justice ("DOJ").

7.      These misrepresentations caused Allergan's stock price to artificially appreciate in value to a Class Period high of $321 per share in the middle of 2015; however, that artificial high was not long sustained.  On August 6, 2015, Allergan announced that it had received a subpoena from the DOJ, Antitrust Division "seeking information relating to the marketing and pricing of certain of the Company's generic

products ….."  This news shocked the market sending the price of Allergan stock plunging $17.17 per share, or approximately 5%, from its previous closing price.

8.    On November 3, 2016, the DOJ announced that Allergan would face charges for antitrust violations along with other pharmaceutical companies.  This announcement caused a further decline in Allergan's stock price of $9.07 per share, or over 4% from its previous closing price.  Allergan stock now trades at $245 per share, down over 23% from its Class Period high of $321.

9.    As fiduciaries of the Plan, defendants were required by law to ensure that Allergan stock remained a prudent investment option for the Plan, and more specifically, for Plan participants' retirement funds.  This duty exists notwithstanding any language in the Plan or any policy adopted by the fiduciaries or the Company that attempted to remove decision-making responsibility for, or discretion over, Allergan stock.

10.    Defendants knew or should have known that Allergan stock had become imprudent during the Class Period because the Company's misrepresentations had artificially inflated Allergan's stock price.  Upon information and belief, defendants are among Allergan's most senior officers, and thus they knew, or should have known, the full extent of the DOJ's investigation, and the likelihood that Allergan and other pharmaceutical companies would be charged.  They also knew or should have known the falsity of Allergan's public statements about its conduct.

11.    For example, Defendant Hilado was Allergan's Chief Financial Officer ("CFO") and, on information and belief, a member of the Investment Committee and the Employee Benefits Committee.  She had direct responsibility for knowing Allergan's financial results and certifying those results as truthful and accurate.  She had direct responsibility for knowing how Allergan set its prices.  If she did not have this knowledge, then she was not doing her job.  Based on her experience and vantage point, she knew or should have known how material and important this information

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYMENT RETIREMENT SECURITY ACT

1  was to the public.  Upon information and belief, the other defendants were also senior

2  corporate officers and had or should have had similar knowledge.

3      12.  Based on their knowledge, defendants were duty-bound by ERISA to

4  prevent harm to the Plan and its participants from undisclosed and/or false material

5  information that they knew or should have known had made Allergan stock an

6  imprudent investment for retirement purposes.  They knew or should have known that

7  the Plan was harmed by every purchase of Allergan stock at inflated prices, and that

8  the Plan's large holdings of Allergan stock were at risk for a sizable downward price

9  correction when the truth finally and inevitably emerged.  They also knew that any

10  fraud or scandal revelation would damage investors'—and employees'—long-term

11  confidence in Allergan, and that this damage would only increase the longer

12  Allergan's fraud lasted.

13      13.  Pursuant to the Plan, and their general powers as ERISA fiduciaries,

14  defendants could have halted new purchases or investments of Allergan stock.

15  Defendants could also have issued truthful or corrective disclosures to cure the fraud

16  and make Allergan stock a prudent investment once again.  At the very least,

17  defendants could have utilized their authority over the Plan to have invested a small

18  but significant portion of the Plan's holdings into a low-cost hedging product that

19  would serve as a buffer to offset some of the damage the Company's fraud would

20  inevitably cause once the truth came to light.

21      14.  Defendants could not reasonably have believed that taking any of these

22  actions would do more harm than good to the Plan or to Plan participants.  Allergan

23  stock traded in an active, liquid and efficient market.  Defendants were—or should

24  have been—familiar with the rudimentary principles of how securities trade in

25  efficient markets.  Thus, they should have known that correcting the Company's fraud

26  would reduce Allergan's stock price only by the amount by which it was artificially

27  inflated to begin with.  They had no basis to believe that any factor was distorting the

28  market for Allergan's stock at the time—such as widespread short-selling or liquidity

problems or the like—and thus no reason to fear that public correction of the Company's fraud would result in an overcorrection of Allergan's stock price.

15. Moreover, defendants knew or should have known that, the longer a fraud of a public company like Allergan persists, the harsher the correction is likely to be when that fraud is finally revealed. Economists have known for years that when a public company like Allergan prolongs a fraud, the price correction when the truth emerges is that much harsher, because not only is the price reduced by the amount of its fraudulent value, but it is reduced by the damage done to the company's overall reputation for trustworthiness as well. Some experts estimate that reputational damage can account for as much as 60% of the price drop that occurs when a fraud is revealed. This figure, moreover, increases over time. So, the earlier a fraud is corrected, the less reputational damage a company is likely to suffer.

16. Such a consideration should have been in the forefront of defendants' minds once they knew (or should have known) that Allergan's stock price was artificially inflated by fraud. The sooner they corrected that fraud, the less reputational damage the Company would suffer, and therefore the gentler the price correction would be. And, in the long term, the Company's reputational trustworthiness would have been less undermined as well, making a swifter price recovery, and greater future gains, more likely. Indeed, the fact that Allergan's price continues to trade at post-revelation levels weeks after the truth came out is evidence that significant damage to the Company's reputation has been done by the Company's prolonged fraud.

17. As a last resort, defendants could have used their authority as fiduciaries to invest some of the Plan's funds into a low-cost hedging product that would behave in a countercyclical fashion vis-à-vis Allergan stock. Such products have been available to providers of ESOPs for many years now. They impose very few transaction costs on a retirement plan, and their proprietary hedging formula allows for an ERISA fiduciary to make at least a contingency plan to deal with the inevitable

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYMENT RETIREMENT SECURITY ACT

drop in stock price that will come from the perpetuation of a corporate fraud.  And, because such hedging products are not derivatives, an ESOP's purchase of them does not qualify as a disclosable event under the federal securities laws.  Defendants' failure to put into action such a hedge strategy therefore resulted in specific financial damage to the Plan, which, upon information and belief, can be quantified with access to necessary fact discovery and through the use of expert analysis.

18.     The point is, defendants knew, or should have known, that no fraud lasts forever.  The federal securities laws, if nothing else, would eventually have forced Allergan to come clean with the public.  Defendants knew (or should have known) that the DOJ's investigation would eventually result in disclosure of the Company's misconduct.  And, because defendants should also have known that, the longer a fraud goes on, the more damage it does to investors—including Plan participants invested in Allergan stock—they should have recognized that acting as soon as possible to end the fraud, or at least to stop further inflated-value purchases, or at least to take on a hedged position, could not have done the Plan or its participants more harm than good.

19.     Moreover, defendants' participation, even if passive, in the deceiving of Plan participants runs counter to ERISA's fundamental obligation that fiduciaries must communicate truthfully and accurately with those to whom a fiduciary duty is owed.  At a minimum, defendants had the fiduciary obligation to disclose the truth to correct the known fraud rather than to perpetuate it.

20.     Indeed, upon information and belief, the Plan was a *net buyer* of Allergan stock during the Class Period.  Even if defendants decided to ignore their obligation to tell Plan participants the truth, they should have recognized that, with more Plan participants buying Allergan stock at inflated prices than selling it at those inflated prices, the fraud was a net harm to the Plan.  (Of course, defendants' duty of loyalty, as well as their obligations under the federal securities laws, should have compelled them not to enable Plan participants to sell stock and reap a windfall at

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYMENT RETIREMENT SECURITY ACT

prices artificially inflated by fraud—regardless of whether the Plan was a net buyer or seller of Allergan stock.)

21.    The Plan participants who chose to purchase Allergan stock (rather than invest in other Plan alternatives) paid fraudulent, excessive prices for the stock during the Class Period.  They suffered concrete financial harm to their retirement savings by over-paying for Allergan stock which, defendants knew, would fall sharply in value when the truth came out and the stock corrected.  From the revelations, Allergan's stock fell by more than 8%.  The Plan participants who purchased Allergan stock were damaged by overpaying this amount.  No matter what happens to the stock price in the future, these Plan participants sustained a loss due to paying the excessive artificial price, and they will bear this loss even if Allergan stock eventually recovers.

22.    Defendants' inaction caused not merely theoretical harm, but concrete damage.  Upon information and belief, over the course of the Class Period, the Plan purchased an estimated $100 million of Allergan stock.  The longer that Allergan's fraud went on, the more Plan purchasers bought at artificially inflated prices, and the size of the harm to each purchaser increased over time as the stock price inflated.  As a result, Allergan's stock had farther to fall when the truth inevitably came out, so that the purchases were hurt even worse as the result of choosing to invest in Allergan stock.

23.    The Plan holders of Allergan shares suffered greater harm and damage in this same manner from defendants' failure to end the fraud.  While they held Allergan shares over the period of time when the stock price was artificially appreciating in value, they were deceived by the false growth.   They suffered greater losses when Allergan's stock price corrected and fell further due to the loss of credibility in the Company and/or the prospect that its growth was based on illegal acts.  They also were deprived of the option of transferring their shares into one of the different, prudent investment alternatives under the Plan, which would have spared them from the greater losses when the stock correction took place.  Those holders who might

need to access their retirement savings before Allergan's stock price manages to recover from the damage done by the Company's fraud—assuming it ever does so—will have to cash out at a lower price than if defendants had corrected the Company's fraud earlier.

24.     Defendant members of the Benefits Committee were fiduciaries of the Plan because they had the authority to appoint and remove the members of the Investment Committee.  As appointing fiduciaries, these defendants were required by law to monitor the Investment Committee to ensure that it was continuing to fulfill its fiduciary duties under ERISA.  When they became aware that the Investment Committee was not taking appropriate actions to protect Plan participants from the harm being caused to them by an ongoing fraud, the defendant members of the Benefits Committee should have removed the Investment Committee from its role as a fiduciary with investment management responsibilities.  The Benefits Committee's failure to do so renders it liable in its capacity as an appointing and monitoring fiduciary.

25.     In conclusion, defendants breached their fiduciary duties to the Plan and its participants—the "highest [duty] known to the law."  While defendants did nothing, Allergan stock price traded up to over $319 per share, and now trades at $245 per share, costing its employees many millions of dollars in retirement savings. Meanwhile, other investments in the Plan have fared far better, causing losses to the Plan and its participants from investment decisions that were based on materially false information.  Defendants are responsible for this enormous harm to the Plan and Plan participants that their breaches of duty have caused.

## I.     JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

27.     Venue is proper in this district pursuant to ERISA § 501 (e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of

the fiduciary breaches for which relief is sought occurred in this district, and defendant Allergan EBC maintains its primary place of business in this district.

## II.    THE PARTIES

28.    Plaintiff Jack Xie is a Plan participant within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  He is a former employee of Allergan who was and continues to be a participant in the Plan.  He purchased and held shares of Allergan in his Plan retirement savings account during the Class Period.

29.    Allergan plc ("Allergan" or the "Company") is incorporated in Ireland with principal executive offices located at Clonshaugh Business and Technology Park, Coolock, Dublin, D17 E400, Ireland.  Allergan plc's subsidiary, Allergan USA, Inc., conducts business in this district and is located at 2525 Dupont Dr., Irvine, CA 92612.  Allergan's securities have traded on the New York Stock Exchange under the ticker symbol "AGN."

30.    Defendant Maria Teresa Hilado is Allergan's CFO and, upon information and belief, a member of both the Investment Committee and the Benefits Committee.  As CFO, Hilado certified Allergan's public SEC filings.  Upon information and belief, she was also a fiduciary of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because she had discretionary authority and control over the Plan and investments in Allergan stock.

31.    The other defendants are members of the Investment Committee and Benefits Committee of the Plan whose names were requested from the Plan administrator but not provided.

## III.    PLAINTIFF'S GOOD-FAITH ATTEMPT TO ASCERTAIN THE IDENTITIES OF THE PLAN'S FIDUCIARIES

32.    On December 1, 2016, plaintiff Xie made a written request to Allergan's Plan Administrator for Plan documents and the identification of the Plan's fiduciaries,

a request that he was entitled to make and have answered under 29 U.S.C. § 1024(b)(4) and other related authorities.

33.     On January 4, 2017, plaintiff Xie received a production of certain Plan documents in response to his request, but Allergan and its Plan Administrator refused to identify, by name or even by job title, the members of the Investment Committee or the Benefits Committee, or to provide any other information about the identities of the Plan's fiduciaries.

34.     Because of Allergan and its Plan Administrator's recalcitrance, plaintiff has been forced to allege his claims on information and belief against those fiduciaries they attempted to identify on their own, as well as against the fiduciary committees themselves, which are juridical entities and proper defendants under ERISA and Department of Labor regulations.  *See* 29 U.S.C. § 1002(9); 29 C.F.R. § 2509.75-5, at FR-1.  *See also Tatum v. RJR Pension Inv. Committee*, 761 F.3d 346, 371 (4th Cir. 2014) (citations omitted).

35.     Additionally, plaintiff Xie in his December 1, 2016 request sought "[a]ny and all agreements, delegations, rules and policies pertaining to the investment of the Plan in Company stock or and/or its monitoring under the Plan."  In response, however, Allergan produced only a single document titled "Investment Policy Statement" from September 2016.

36.     Plaintiff intends to seek an order from the Court requiring Allergan to provide the names of the members of the Investment Committee and Benefits Committee, and they reserve their right to amend this complaint based on the receipt of this information.

## IV.    THE PLAN AND ITS FIDUCIARIES

37.     Allergan was formed when its predecessor, Actavis plc, acquired Allergan, Inc., and changed its corporate name to "Allergan plc."  This acquisition was announced on November 17, 2014 and closed on June 15, 2015.  Consequently, Allergan has two retirement savings plans subject to ERISA.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYMENT RETIREMENT SECURITY ACT

38.     The Allergan Inc. Savings and Investment Plan is a defined contribution benefit plan that was originally sponsored by Allergan Inc.  Upon completion of the acquisition by Actavis plc, Allergan became the sponsor of this Plan and merged a former employee stock ownership program into the Plan.  The Plan has approximately 8,000 participants and over $1.4 billion in assets, including large holdings of Allergan stock.

39.     The Actavis Inc. 401(k) Plan is a defined contribution benefit plan that was sponsored originally by Actavis Inc.  Upon completion of the acquisition, Allergan became the sponsor of this Plan, which has 11,000 participants and over $690 million in assets, including large holdings of Allergan stock.

40.     On March 17, 2015, the Boards of Directors for both companies adopted and approved a "uniform governance structure for the management and administration" of the two Plans.  Since that time, both Plans have had the same Plan administrators and fiduciaries, and together shall be referred to collectively as the "Plan."

41.     Defendant Investment Committee was and is a "Named Fiduciary" of the Plan and comprises, upon information and belief, Allergan's most senior corporate officers, including CFO Hilado.  Pursuant to section 9.2 of the Plan, the Investment Committee "shall exercise management and control over the assets of the Trust" and thus is responsible for overseeing the prudence of all investment options available under the Plan, including Allergan stock.  Pursuant to sections 9.6(i) and (j) of the Plan, defendant Investment Committee is also empowered to "direct the Trustee … to invest and reinvest the Trust Fund … [and] to direct the purchase and sale of Company Stock…."

42.     Thus, if investment in Allergan stock contravenes applicable law—like if it becomes imprudent under ERISA—the Investment Committee is empowered to take necessary action to protect Plan participants, including temporarily ceasing new

investments in Allergan stock until such time as it becomes a prudent investment again.

43.     As the Supreme Court has made clear in *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014), defendants' fiduciary duty to ensure the prudence of Allergan stock cannot be eliminated.  While the Plan contains language suggesting that defendants were not responsible for investment decisions, the Plan also required defendants to adhere to the requirements of ERISA, and *Dudenhoeffer* makes clear that defendants could not be bound by preclusive Plan language if Allergan became an imprudent investment.

44.     Defendants also could have effectuated disclosure of the truth to the public in order to correct the artificial inflation that had given rise to Allergan's imprudence in the first place.  As high-level corporate officers, defendants could have petitioned those with disclosure responsibilities to correct the fraud.  Such disclosure would have consistent with, and, indeed, required by, the federal securities laws and ERISA.

45.     Defendant Benefits Committee was and is a "Named Fiduciary" of the Plan and comprises, upon information and belief, Allergan's most senior corporate officers.  Pursuant to section 9.2 of the Plan, the Benefits Committee "shall monitor the performance of the … Investment Committee…."

46.     According to the September 2016 "Investment Policy Statement" produced by Allergan, it appears that neither the Investment Committee nor the Benefits Committee conducted any oversight at all over Allergan stock for prudence. Instead, they adopted a specific "hands-off," take-no-action policy over Allergan stock.  In other words, defendants' official policy regarding their fiduciary duties was that they were required to do *nothing* to protect Plan participants' retirement savings in Allergan stock *under any circumstances*.

47.     When Allergan stock became an imprudent investment for retirement savings, defendants knew that action was needed to prevent harm to the Plan and its

participants.  Allergan stock represented the single largest holding of the Plan and, each year, employees purchased millions of dollars of Allergan stock with their additional and matching contributions.  Defendants knew that any fraud or material non-disclosure about Allergan which hurt its stock price would cause substantial harm to the Plan.  Yet, in direct violation of ERISA, defendants intentionally adopted a policy of taking no action whatsoever.

## V.    ALLERGAN'S FRAUD MADE ITS STOCK IMPRUDENT

**A.    <u>Materially False and Misleading Statements</u>**

48.    On February 25, 2014, Actavis plc filed a Form 10-K for the fiscal year ended December 31, 2013 (the "2013 10-K") with the SEC, which provided Actavis plc's year-end financial results and position.  The 2013 10-K discussed the strategies utilized by Actavis plc to grow its business, stating in pertinent part:

> **Business Strategy**
>
> We apply three key strategies to achieve growth for our Actavis Pharma and Actavis Specialty Brands pharmaceutical businesses: (i) internal development of differentiated and high-demand products, including, in certain circumstances, challenging patents associated with (ii) these products, (ii) establishment of strategic alliances and collaborations and (iii) acquisition of products and companies that complement our current business.

49.    The 2013 10-K discussed the strategies utilized by Actavis plc "to effectively compete in the distribution market[,]" stating in pertinent part:

> We believe that we are able to effectively compete in the distribution market, and therefore optimize our market share, based on three critical elements: (i) competitive pricing, (ii) high levels of inventory for approximately 12,725 SKUs for responsive customer service that includes, among other things, next day delivery to the entire U.S., and (iii) well established telemarketing relationships with our customers, supplemented by our electronic ordering capabilities.

50.    On February 18, 2015, Actavis plc filed a Form 10-K for the fiscal year ended December 31, 2014 (the "2014 10-K") with the SEC, which provided Actavis plc's year-end financial results and position and stated that its internal control over its financial reporting and disclosure controls and procedures were effective as of December 31, 2014.

51.    The 2014 10-K discussed the strategies utilized by Actavis plc to grow its business, stating in pertinent part :

**Business Strategy**

We apply three key strategies to achieve growth for our North American Brands and North American Generics and International businesses: (i) internal development of differentiated and high-demand products, including, in certain circumstances as it relates to generics, challenging patents associated with these products, (ii) establishment of strategic alliances and collaborations and (iii) acquisition of products and companies that complement our current business.

52.    The 2014 10-K discussed the strategies utilized by Actavis plc "to effectively compete in the distribution market[,]" stating in pertinent part:

We believe that we are able to effectively compete in the distribution market, and therefore optimize our market share, based on three critical elements: (i) competitive pricing, (ii) high levels of inventory for 24 approximately 12,650 SKUs for responsive customer service that includes, among other things, next day delivery to the entire U.S., and (iii) well-established telemarketing relationships with our customers, supplemented by our electronic ordering capabilities.

53.    On February 26, 2016, Allergan filed a Form 10-K for the fiscal year ended December 31, 2015 (the "2015 10-K") with the SEC, which provided Allergan's year-end financial results and position and stated that its internal control over its financial reporting and disclosure controls and procedures were effective as of December 31, 2015.

54.    The 2015 10-K discussed the strategies utilized by Allergan plc to grow its business, stating in pertinent part:

**Business Strategy**

We apply three key strategies to achieve growth for our US Brands, US Medical Aesthetics and International Brands businesses: (i) internal development of differentiated and high-demand products, 16 (ii) establishment of strategic alliances and collaborations and (iii) acquisition of products and companies that complement our current business.

55.    The 2015 10-K discussed the strategies utilized by Allergan plc "to effectively compete in the distribution market[,]" stating in pertinent part:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYMENT RETIREMENT SECURITY ACT

We believe that we are able to effectively compete in the distribution market, and therefore optimize our market share, based on three critical elements: (i) competitive pricing, (ii) high levels of inventory for approximately 13,200 SKUs for responsive customer service that includes, among other things, next day delivery to the entire U.S., and (iii) well-established telemarketing relationships with our customers, supplemented by our electronic ordering capabilities.

56.    The statements referenced in the 2013, 2014, and 2015 10-K reports were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to Allergan's business, operational and financial results, which were known to, or should have been known to, defendants at the time:  (1) Allergan was engaging and/or had engaged in conduct that would result in an antitrust investigation by DOJ; (2) the DOJ investigation and the underlying conduct could cause U.S.  prosecutors to file criminal charges against Allergan for suspected price collusion; (3) Allergan lacked effective internal controls over financial reporting; and (4) as a result, Allergan's public statements were materially false and misleading at all relevant times.

57.    Based on the false and inaccurate perception the public had about Allergan's financial performance resulting from Allergan's false and materially misleading statements, Allergan's stock price artificially appreciated rising to a Class Period high of $321 per share in the middle of 2015.

**B.    The Truth Begins to Emerge**

58.    On August 6, 2015, Allergan filed a Form 10-Q for the period ended June 30, 2015, announcing that, "[o]n June 25, 2015, the Company received a subpoena from the U.S. Department of Justice ("DOJ"), Antitrust Division seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."

59.    On August 6, 2015, Bloomberg published an article titled "Allergan Brought Into Widening U.S. Probe of Generic Drug Prices," revealing that "Allergan Plc's Actavis unit got a subpoena from the U.S. Justice Department seeking information on the marketing and prices of its generic drugs, becoming the biggest

company yet to draw scrutiny in the government's widening antitrust probe of the industry" joining other companies who "have made similar disclosures in the past several months."

60.    On this news, shares of Allergan plc fell $17.17 per share, or approximately 5%, from its previous closing price to close at $319.47 per share on August 6, 2015, damaging investors.

61.    On November 3, 2016, Bloomberg published an article titled "U.S. Charges in Generic-Drug Probe to Be Filed by Year-End," revealing that in connection with the U.S. Justice Department's investigation of a dozen companies, including Allergan plc, U.S. prosecutors may file criminal charges by the end of 2016 for 8 suspected price collusion, stating in pertinent part:

**U.S. Charges in Generic-Drug Probe to Be Filed by Year-End**

November 3, 2016 — 2:10 PM EDT U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion, a fresh challenge for an industry that's already reeling from public outrage over the spiraling costs of some medicines.

The antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs, according to people familiar with the matter. The grand jury probe is examining whether some executives agreed with one another to raise prices, and the first charges could emerge by the end of the year, they said.

Though individual companies have made various disclosures about the inquiry, they have identified only a handful of drugs under scrutiny, including a heart treatment and an antibiotic. Among the drugmakers to have received subpoenas are industry giants Mylan NV and Teva Pharmaceutical Industries Ltd. Other companies include Actavis, which Teva bought from Allergan Plc in August, Lannett Co., Imax Laboratories Inc., Covis Pharma Holdings Sarl, Sun Pharmaceutical Industries Ltd., Mayne Pharma Group Ltd., Endo International Plc's subsidiary Par Pharmaceutical Holdings and Taro Pharmaceutical Industries Ltd.

\*        \*        \*

Allergan, Impax and Sun declined to comment beyond their filings. Representatives of Endo, Covis, Taro and Lannett didn't respond to requests for comment. A Justice Department spokesman declined to comment.   Shares of all companies named in the investigation fell on the news. Lannett dropped 27 percent to close at $17.25 in New York trading.  Impax fell 20 percent to $16.50. Endo declined 19 percent to

$14.63, while Teva slipped 9.5 percent to $39.20, Allergan fell 4.6 percent to $188.82 and Mylan fell 6.9 percent to $34.14. Shares of Concordia International Corp., which bought most of Covis's assets, fell 5.6 10 percent to 4.37 Canadian dollars. Taro shares fell 7.3 percent to $93.68. [Emphasis added].

62.     On this news, shares of Allergan fell $9.07 per share, or over 4% from its previous closing price, to close at $188.82 per share on November 3, 2016, further damaging investors.

63.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of Allergan securities, plaintiff and other Class members have suffered significant losses and damages.

## VI.    THE PLAN'S FIDUCIARY BREACHES:  ALTERNATIVE ACTIONS THAT SHOULD HAVE BEEN TAKEN

64.     Throughout the Class Period, defendants, as Allergan's most senior officers knew or should have known that Allergan's financial results were not legitimately based on its sales, marketing and competitive success, but that they were instead the result of possibly illegal, anti-competitive price collusion.  They knew or should have known the full extent of the DOJ's investigation, and the likelihood that formal charges would be filed against Allergan.  They knew or should have known the falsity of the Company's public statements about Allergan and that Allergan's stock price was artificially inflated by this ongoing fraud.

65.     As Plan fiduciaries, defendants knew or should have known that Allergan's fraud and undisclosed material information made its stock an imprudent investment for the Plan.  They knew or should have known that the Plan was experiencing ongoing present harm as all purchasers of Allergan stock paid artificially inflated prices, and that all shareholders in the Plan would suffer from the inevitable price correction that would occur when the truth eventually came out and the fraud was exposed.  This immediate and future harm to the Plan could and would have been avoided, in whole or in part, if defendants had complied with their ERISA fiduciary duties.

66.    As Plan fiduciaries, defendants were required to:  (a) investigate and monitor whether Allergan stock was a prudent retirement investment; (b) freeze or restrict additional purchases of the Allergan stock by the Plan; (c) issue corrective disclosure about Allergan; and/or (d) hedge the Plan's exposure.  Notwithstanding these duties, defendants did nothing (and apparently adopted "do nothing" as their official policy) to protect the retirement savings of the Plan participants to whom they owed fiduciary duties from the harm caused by the Company's undisclosed fraud and artificial inflation of Allergan's stock price.

A.    **Corrective Disclosures Should Have Been Made and Would Not Have Caused "More Harm Than Good"**

67.    Defendants themselves should have issued the necessary truthful or corrective disclosures to cure the fraud and to make Allergan's stock a prudent investment again for the Plan.  Defendants, alternatively, should have sought out those Company executives with responsibility for making disclosures under the securities laws and entreated them to make the necessary corrective disclosures about Allergan.  And, if they were refused, defendants themselves could have issued the necessary truthful or corrective disclosures to the public as a whole.

68.    Disclosure of the truth to the public was necessary to correct the artificial inflation of Allergan's stock and to prevent both present and future harm to the Plan.  Disclosure would have ended the artificial inflation in Allergan's stock price, which was damaging all purchasers through the Plan who paid excessive, fraudulent prices for the stock.  Upon information and belief, there were at least $100 million of new purchases during the Class Period through the Plan made at artificially high prices.  Defendants could have prevented some or all of this damage and harm through truthful disclosure.

69.    For example, if defendants had tried to effectuate corrective public disclosure near the very beginning of Allergan's fraud—at the beginning of the Class Period—almost all of the artificial inflation of Allergan's stock price that occurred

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYMENT RETIREMENT SECURITY ACT

could have been avoided, and virtually no Plan participants who purchased shares would have been harmed.  But as the fraud went on and on, more and more Plan participants made purchases at artificially high prices, and thus the harm to Plan participants steadily increased.  As two experts framed the issue:

> If the fraud occurs on one day at the beginning of the class period so that the gap between the value line and the price line appears immediately, the bias will be small because only investors who purchased the securities in the first few days of the class period are affected by the error.  However, if the fraud consists of a series of omissions and misrepresentations so that the gap between the price line and the value line widens slowly, the inflation will be overstated for a much larger group of purchasers.

Bradford Cornell and R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. Rev. 883, 911 (1990) (emphasis added).

70.    Moreover, upon information and belief, the Plan was a net *buyer* of Allergan stock during the Class Period, meaning that the Plan participants being directly harmed by buying the stock at artificially inflated prices outnumbered those Plan participants fortunate enough to be selling their stock at artificially inflated prices and thus reaping a windfall from Allergan's fraud.  Thus, even setting aside the basic impropriety of allowing Plan participants to be defrauded, defendants should have recognized that more Plan participants were being harmed by the fraud than helped by it—in other words, the continuation of the fraud *was doing more harm than good to Plan participants*.

71.    Defendants also needed to act to prevent future harm and damage to the Plan's approximately $600 million investment in Allergan stock.  This position was at risk from a large stock price correction when the public learned the truth and realized that Allergan's management had concealed a fraud.  As time passed, Allergan's stock price inflated further due to the fraud and the size of the scandal grew, making the eventual collapse worse.  The concealment of the fraud put the Plan's $600 million of Allergan at risk for a serious and lasting decline in value, hurting management's

19

credibility and the long-term prospects of Allergan as an investment. This significant harm to the Plan could have been prevented or mitigated by timely disclosure.

72.    This reputational damage is not merely theoretical. Economists and finance experts have conducted numerous empirical studies on these issues, and they have concluded that "the reputational penalty" a company suffers because it perpetrates a prolonged fraud is significantly greater than any regulatory fines or other penalties that it may occur—in fact, the reputational penalty is "7.5 times the sum of all penalties imposed through the legal and regulatory system." Jonathan M. Karpoff, D. Scott Lee and Gerald S. Martin, *The Cost to Firms of Cooking the Books, Journal of Financial and Quantitative Analysis*, Vol. 43, No. 3 (Sept. 2008). Moreover, "[f]or each dollar that a firm misleadingly inflates its market value, on average, it loses this dollar when its misconduct is revealed, plus an additional $3.08 … **[of which] $2.71 is due to lost reputation**." *See id.* (emphasis added). And this reputational damage, unsurprisingly, increases the longer the fraud goes on. *Id.*

73.    Indeed, as of the date of this pleading, Allergan's stock continues to trade at roughly the same price as it did after the truth of its fraud was revealed weeks ago, confirming that the damage to the Company's reputation caused by its prolonging of its fraud has been significant.

74.    Defendants cannot argue that the federal securities laws prevented them from making truthful disclosure. In this situation, ERISA and the federal securities laws compelled defendants on the one hand and Allergan on the other to take exactly the same action—tell the truth and correct the inflated stock price. No law or duty required them to conceal or prevent the disclosure of the truth—quite the opposite.

75.    This also means that defendants knew—or should have known—that disclosure of the fraud was going to happen one way or another. The federal securities laws required disclosure. Allergan was under criminal investigation by the DOJ. As senior executives of Allergan, defendants knew or should have known how the DOJ's investigation was going to turn out—violation of the criminal antitrust laws

1    tends to end with public exposure of the violator.  Thus, the truth was eventually
2    going to become public about the Company's misconduct; the only question was
3    whether it was going to emerge because defendants (and the Company) did the right
4    thing and voluntarily disclosed the truth themselves, or because the DOJ announced
5    to the world the extent of Allergan's crimes—which is, unfortunately, exactly what
6    ended up happening.

7        76.    In other words, Allergan's misrepresentation was a ticking time bomb.
8    Eventually, that bomb would go off and the truth would have to be disclosed, bringing
9    the artificial inflation of Allergan's stock to a painful end.  If defendants were really
10   considering what action would do Plan participants more harm or good, they should
11   have considered that, given the overwhelming likelihood of the truth coming out, a
12   stock price correction was unavoidable—the only relevant question for them should
13   have been whether it would be better for Plan participants for the correction to occur
14   sooner or later.  This was not a situation where defendants could cover their eyes and
15   ears and hope to wait out the Company's fraud.  Given the well-established evidence
16   and research showing that later disclosure of fraud leads to a harsher price correction,
17   defendants should have recognized that earlier disclosure was by far the less harmful
18   option than the one that they did choose—namely, doing nothing until media
19   investigations forced the Company to acknowledge the truth.  This decision by
20   defendants led to a much harsher price correction than was necessary, one that
21   investors, including Plan participants, are still suffering the consequences of today.
22   The question was not whether defendants could prevent a stock drop due to
23   Allergan's fraud, but when that drop would occur, and how severe it would be.
24   Defendants should have recognized that the sooner they acted, the less severe the
25   drop, and, therefore, the less harm to the Plan and to Plan participants.

26       77.    Moreover, had defendants effectuated corrective disclosures—either
27   through entreaties to Allergan's executives with disclosure responsibilities, or through
28   disclosures they made themselves—the market likely would have reacted more

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYMENT RETIREMENT SECURITY ACT

favorably.  Voluntary self-reporting of a fraud by a corporate entity is likely to result in a gentler stock price correction than if the revelation of fraud is revealed by the government or the media or a whistleblower.  As defendants well should have known, the cover-up is often worse than the crime.  Thus, by choosing to do nothing, defendants ensured that Allergan's stock price correction would be worse than it otherwise should have been, and more harm to the Plan and Plan participants was thus caused.

78.    Defendants could not have reasonably believed that effectuating truthful, corrective disclosure would do "more harm than good" to the Plan or its participants. First and foremost, even the passive participation of defendants in a fraud or its concealment runs counter to ERISA's fundamental obligation that fiduciaries must communicate truthfully and accurately with those to whom a fiduciary duty is owed. At a minimum, defendants had the fiduciary obligation to disclose the truth to correct the known fraud and not participate in its concealment.

79.    Truthful disclosure was also needed to prevent worse future harm to the Plan and Allergan's stock price. Defendants may argue that they were concerned that correcting the fraud would temporarily lower the stock price, but that concern should not have deterred disclosing the truth.  Every stock fraud in history, when corrected, has resulted in a temporary drop in the stock price; that is an inherent quality of efficient markets.  But, in virtually every fraud case, the longer the fraud persists, the harsher the correction tends to be.  Defendants should have disclosed the truth sooner rather than later to minimize the ongoing harm (to prevent further artificial inflation and purchases at excessive prices), as well as worse future damage to Allergan's stock price.

80.    Defendants' inaction towards the known fraud caused not merely theoretical harm, but concrete damage.  Upon information and belief, over the course of the Class Period, the Plan purchased approximately $100 million of Allergan stock at inflated prices that worsened over time.  And, upon information and belief, there

were more of those purchasers than sellers in the Plan during the Class Period, making the "more harm than good" analysis that defendants should have conducted—but didn't—even starker.

81.    Plan participants who held Allergan shares likewise suffered greater harm because of defendants' failure to end the fraud. While they held Allergan stock over the period of time when the stock price was artificially appreciating in value, they were deceived by its false growth. They suffered greater losses when Allergan's stock price corrected and fell further due to the loss of management credibility, reputational damage and ongoing prosecution of the Company. They also were deprived of the option of transferring their shares into one of the different, prudent investment alternatives under the Plan, which would have spared them from the greater losses when the stock correction took place.

82.    Additionally, the issuance of a corrective disclosure was required by the federal securities laws. By the very same mechanism that Allergan could have used to make corrective disclosures to the general public under the federal securities laws (at the urging of defendants), defendants could also have made disclosures to Plan participants, because Plan participants are, after all, part of the general public. Defendants did not have to make a "special" disclosure only to Plan participants, but could simply have made one corrective disclosure to the world and thereby simultaneously satisfied its obligations under the federal securities laws and ERISA. As both a Plan fiduciary and a Sarbanes-Oxley signatory, defendant and CFO Hilado was ideally situated to do just that.

83.    Indeed, earlier disclosure would have affirmatively benefitted the Plan and its participants, as well as mitigated the harm that was being done to them. With the truth, Plan participants could properly evaluate Allergan stock versus their other investment alternatives for their retirement savings. Plan participants considering new purchases with their annual contributions could select healthier, prudent investment options such as diversified mutual funds which outperformed Allergan

stock during the Class Period.  Over the long term, defendants' failure to expose Allergan's fraud will likely have a chilling effect on future purchases of Company stock by Plan participants, whose trust in their employer has been eroded by this malfeasance.  Such an effect constitutes another net harm to the Plan.

**B.    All New Purchases Should Have Been Halted and Would Not Have Caused "More Harm Than Good"**

84.    Under ERISA, defendants were specifically responsible for the Plan's investments and monitoring the investments, including Allergan stock, and were bound to take whatever actions were required to maintain the prudence of those investments, regardless of any language in the Plan that purported to strip them of that responsibility.

85.    Defendants had the power under the Plan to halt all new contributions or investments into Allergan stock once defendants knew (or should have known) that Allergan stock was an imprudent investment because its stock price was inflated by fraud and undisclosed material information.

86.    Defendants were duty-bound by ERISA to prevent the present and future harm to the Plan and its participants due to the Company's undisclosed and misrepresented material information.  Defendants knew or should have known that every purchase made under the Plan of Allergan stock was being made at a fraudulently inflated price—and thus would harm those purchasers.

87.    As fiduciaries tasked with the management of Plan investments, including investments in Allergan stock, defendants knew or should have known that the Plan was purchasing millions of dollars of Allergan stock during the Class Period at inflated prices.  They also knew or should have known that the inflation was getting worse, damaging each purchaser more as the fraud and price inflation continued. Defendants had a duty to stop the Plan from purchasing at fraudulent prices and to mitigate the damage the fraud was causing the Plan as early as possible.

88.    Defendants also knew that as the fraud continued, the Plan's purchasers of Allergan stock were at risk for a greater downward price correction when the truth emerged.    This downward price correction would be worse the longer the fraud continued.    They also knew or should have known that any revelation of fraud would damage Allergan's reputation with investors, and that the damage would be worse the longer it lasted.    Therefore, defendants had a duty to act to prevent worse future damage to the Plan's purchasers.

89.    Defendants could not have reasonably believed that restricting new purchases of Allergan stock would likely do "more harm than good" to the Plan or its participants.    They had a duty to prevent the present and future harm from the Plan's overpayment for Allergan stock at excessive prices.    And the act of simply preventing new purchases at inflated prices would not constitute "insider trading" because there is no transaction in securities or any benefit conveyed to insiders.

90.    Additionally, the act of halting new purchases itself also would not constitute "inside information" the same way that publicly reported insider sales are legal and do not reveal any "inside information."    Halting new purchases would also be unlikely to have a material impact on Allergan's stock price, because the volume of purchases by the Plan was only a small percentage of the overall stock trading volume.    But, even if halting purchases did have a negative impact on the stock price, it would only be reducing the artificial inflation of the stock, which ultimately would benefit Plan participants by enabling them to avoid the harm of buying and holding shares at inflated prices.    And, by not halting purchases, defendants enabled substantial additional harm to be done to Plan participants.

91.    The SEC has stated that, as long as both purchases and sales are halted for an ESOP, the insider-trading laws are not implicated.    So, to ensure compliance with the securities laws, defendants just had to effectuate a temporary halt, so that no need purchases or sales could be made, until the time came when the Company's fraud finally ended.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYMENT RETIREMENT SECURITY ACT

92.     Even if the defendants' temporary halt necessitated a public disclosure under the securities laws, such an action would be all to the good.  Any reduction caused by such a disclosure would only be a reduction in the artificial inflation of the fraudulent stock price.   Such a disclosure might encourage Allergan's senior executives to go the rest of the way, do the right thing and make a full corrective disclosure.  At the very least, harm to the Plan and Plan participants would have been mitigated.

93.     The Plan participants who chose to purchase Allergan stock paid fraudulent, excessive prices for the stock during the Class Period.  They suffered concrete financial harm to their retirement savings by over-paying for Allergan stock which, defendants knew, would fall sharply in value when the truth came out and the stock corrected.  When the fraud was revealed, Allergan's stock fell by more than 8%, or over $26 per share.  Those Plan participants who purchased Allergan's stock were damaged by overpaying this amount, and they bore this foreseeable loss which could have been avoided.  No matter what happens to the stock price in the future, these Plan participants sustained a loss due to paying the excessive artificial price, and they will bear this loss even if Allergan's stock recovers in the future.  Defendants should have acted to prevent this concrete, present harm to the Plan.

94.     Moreover, by failing to halt new purchases of Allergan stock, the Plan participants were also denied the opportunity to invest in the prudent alternative investment options under the Plan.  These investment options included various mutual funds which invested in the broad securities markets.  These mutual funds performed well during 2016, and the Plan participants were damaged because their money went into artificially inflated stock that was poised to decline, rather than the alternative appreciating funds.

**C.    Defendants Should Have Directed a Portion of the Plan Into a Low-Cost Hedging Product**

95.    As a last resort, defendants could have their utilized their authority over the Plan to invest a small but significant portion of the Plan's cash into the purchase of a low-cost hedging product.  Such products, like the ESOP Protection Trust offered by StockShield, LLC, have been widely available to ESOPs for many years now. They are not derivatives, and therefore their purchase need not be disclosed under the securities laws.  Their costs are relatively small, and are certainly far less than the losses the Plan inevitably experienced on Allergan stock when its fraud came to light. These hedging products are designed to trade counter to Allergan stock so that, when the Plan did experience losses on Allergan stock as its fraud came to light, those losses would have been lessened by the hedging position.

96.    Such products can be funded through a variety of means, including using the Plan's liquid assets, the provision of cash by the Plan Sponsor, or by the Plan's securing third-party financing to purchase such a product.  Generally, in cases where the Plan's Sponsor is such a large corporation like Allergan, the hedging product would be funded by way of a cash contribution made by Allergan to the Plan itself which would then purchase the product, or Allergan could purchase the product for the Plan as beneficiary.

97.    Even if Allergan, as the Plan's Sponsor, was not a viable option to provide cash to the Plan, the Plan itself could have provided the cash to pay for the product.  Alternatively, Plan had the option of financing the purchase of the product. But, given the low cost of the product and the enormous risk of loss the Plan was facing due to the artificial inflation of the Company's stock price, the use of Plan funds for this end could not reasonably have been viewed as likely to cause more harm than good to the Plan or to its participants.

98.    Available hedging products are structured as irrevocable trusts that pool funds together from a group of financially healthy and diverse companies for a fixed

period of time.  Applicants are thoroughly screened and vetted for the benefit and protection of other participating companies.  (Despite its ongoing misconduct, however, Allergan still would have qualified for participation in one of these pools.) The trust is managed by an independent third party.  During a fixed time period, the pooled funds are invested safely and securely, typically in United States Treasury securities.  At the conclusion of the fixed period, the trust restores losses caused by declines in the price of company stock.

99.    The benefits of these low-cost hedging products far outweigh their risks. First, the cost is extremely low.  Typical products offering this protection only require annual cash deposits of 1-2%.  However, if the trust is not required to restore any losses to participating companies, refunds of over half of the amount of the annual contributions are typically issued to participants.  This can bring the cost of participation down to 0.10% per year.  Second, should the participant's stock appreciate in value during the fixed period, the participant retains all of the benefit of that appreciation, and all of the benefit of any dividends paid.

100.   In addition, nothing in the governing Plan documents or in the ERISA statute would have required disclosure of this highly-circumscribed hedging effort to the public, regulators, or even to Plan participants.  An ESOP hedging product could have been utilized by defendants without fear of "spooking the market" (to the extent that would even be a rational fear given the likelihood of Allergan's fraud coming to light).  Nor would use of Plan or Plan Sponsor cash to participate in a pool of funds being typically invested in U.S. Treasuries have implicated the insider trading laws in any way; no Plan stock would need to be sold to finance this effort.

101.   Thus, once defendants became aware of Allergan's fraud and the artificial inflation of the Company's stock, they should have sought out a low-cost hedge product to soften the blow to Plan participants that would come when the fraud was finally revealed.

102.   Had defendants sought to hedge the Plan's Allgeran's stock holdings, they could have mitigated the damages caused to the Plan and Plan participants by Allergan's fraud.  At the very least, they should have undertaken a minimum of due diligence to investigate the existence of ESOP hedging products and other potential hedging strategies given the obvious concerns generated by the artificial inflation of Allergan's stock.  But they did nothing, and Plan participants suffered catastrophic losses as a result of this inaction.

## VII.   CLASS ACTION ALLEGATIONS

103.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(l) and/or (b)(2) on behalf of himself and the following class of persons similarly situated (the "Class"):

> All individuals, excluding defendants, who participated in the Plan and whose individual accounts purchased and/or held Allergan stock or the Allergan Stock Fund at any time March 17, 2015, through November 3, 2016, inclusive.

104.   Excluded from the Class are defendants, other officers and directors of the Company, members of defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

105.   The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are at least 19,000 members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company or the Plan and may be notified of the pendency of this action by mail using the form of notice similar to that customarily used in securities class actions.

106.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

107.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

i.     Whether defendants each owed a fiduciary duty to the Plan, to plaintiff and to members of the Class;

ii.    Whether defendants breached fiduciary duties owed to the Plan, plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;

iii.   Whether defendants violated ERISA; and

iv.    The extent to which Class members have sustained damages and the proper measure of those damages.

108.   Plaintiff's claims are typical of the claims of the members of the Class because plaintiff and the other members of the Class each sustained damages or were negatively affected by defendants' wrongful conduct in violation of ERISA as complained of herein.

109.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel highly competent and experienced in class action and complex litigation, including actions involving ERISA plans.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

110.   Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because this action is also brought on behalf of the Plan, and any prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to the Plan which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

111.   Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for defendants; and (ii)

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYMENT RETIREMENT SECURITY ACT

1  defendants have acted or refused to act on grounds generally applicable to the Class,
2  thereby making appropriate final injunctive, declaratory or other appropriate equitable
3  relief with respect to the Class as a whole.

4      112.   Plaintiff also brings this action on behalf of the Plan pursuant to
5  ERISA §§ 409(a), 502(a)(2), 29 U.S.C. §§ 1109(a), 1132(a)(2).

## COUNT I

### Failure to Prudently and Loyally Manage the Plan's Assets

8      113.   Plaintiff incorporates the allegations contained in the previous
9  paragraphs of this Complaint as if fully set forth herein.

10     114.   At all relevant times, as alleged above, each defendant member of the
11  Investment Committee, including, upon information and belief, CFO Hilado, was a
12  fiduciary within the meaning of ERISA § 3(21)(a), 29 U.S.C. § 1002(21)(A) in that he
13  or she exercised discretionary authority or control over the administration and/or
14  management of the Plan or disposition of the Plan's assets.

15     115.   Under ERISA, fiduciaries who exercise discretionary authority or control
16  over management of a plan or disposition of a plan's assets are responsible for
17  ensuring that investment options made available to participants under a plan are
18  prudent.  Furthermore, such fiduciaries are responsible for ensuring that all
19  investments in the Company's stock in the Plan were prudent and that such
20  investment was consistent with the purpose of the Plan.  Each defendant member of
21  the Investment Committee is thus liable for losses incurred as a result of such
22  investments being imprudent.

23     116.   A fiduciary's duty of prudence requires it to disregard plan documents or
24  directives that it knows or reasonably should have known would lead to an imprudent
25  result or would otherwise harm plan participants or beneficiaries. ERISA §
26  404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D).  Thus, a fiduciary may not blindly follow
27  plan documents or directives that would lead to an imprudent result or that would

28

harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plans, including plan trustees, to do so.

117.  Each defendant member of the Investment Committee breached his or her duties to prudently manage the Plan's assets.  During the Class Period, each Investment Committee member knew or should have known that Allergan stock had become an imprudent investment for Plan participants' retirement savings because its stock price was inflated due to fraud and undisclosed material information.  The Investment Committee knew or should have known that Allergan had engaged in fraudulent misrepresentations and had possibly engaged in violations of the criminal antitrust laws for which the Company was under investigation by the DOJ.

118.  Accordingly, the Investment Committee should have taken appropriate responsive action by:  effectuating disclosures that would have corrected the stock price and rendered Allergan stock a prudent investment again; restricting transactions or new investments by the Plan in Allergan stock; or, using a small but significant portion of Plan funds to purchase a low-cost hedging product to mitigate the harm that the Company's stock price correction would inevitably cause upon the revelation of Allergan's fraud.

119.  The Investment Committee was obligated under ERISA to discharge its duties with respect to the Plan solely in the interests of Plan participants and for the exclusive purpose of providing benefits to Plan participants.

120.  As part of this fiduciary duty of loyalty, the Investment Committee was obligated to be truthful in all communications with Plan participants and not to knowingly allow material information to be fraudulently concealed from Plan participants.

121.  Once the Investment Committee knew or should have known that the Company's stock price had become artificially inflated by fraud, and that Plan participants who bought and held shares of Allergan stock were therefore being victimized by this fraud, the Investment Committee's duty of loyalty should have

compelled it to be truthful with Plan participants and not to allow them to continue to be victimized by the Company's fraud.  The Investment Committee's duty of loyalty should have compelled it to effectuate truthful, corrective disclosure to the general public, and thus to Plan participants, as was also required of the Company under the federal securities laws.  The Investment Committee's passive failure to prevent an ongoing fraud being perpetrated against Plan participants thus breached its fiduciary duty of loyalty.

122.  As such, between March 17, 2015, through November 3, 2016, Plan participants could not appreciate the true risks presented by investments in Allergan's stock and, therefore, could not make informed decisions regarding their investments.

123.  As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly plaintiff and other Plan participants, suffered foreseeable damage to and/or lost a significant portion of their retirement investments.  Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), the Investment Committee defendants, including, upon information and belief, CFO Hilado, are liable to restore the losses to the Plan caused by their breaches of fiduciary duty.

## COUNT II

### Failure to Monitor Fiduciaries

124.  Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

125.  As alleged above, the Benefits Committee was responsible for oversight of the Investment Committee and therefore was also a Plan fiduciary under 29 U.S.C. § 1002(21)(A).

126.  As appointing fiduciaries, the members of the Benefits Committee, including, upon information and belief, CFO Hilado, were obligated to monitor the performance of their appointees to ensure that they continued to adhere to their fiduciary duties, including those with respect to the investment and monitoring of

33

Plan assets.  A monitoring fiduciary must take prompt and effective action to protect the Plan and its Participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA.  Even if its fiduciary monitoring responsibilities were delegated to others, the Benefits Committee still had an obligation to ensure that any delegated tasks were being performed prudently and loyally.

127.   The Benefits Committee breached its fiduciary monitoring duties by, among other things:

(a)   Failing to monitor and evaluate the performance of the Investment Committee defendants or have a system in place for doing so, standing idly by as the Plan suffered losses as a result of the defendants' imprudent actions and omissions;

(b)   failing to monitor the processes by which Plan investments were evaluated, which would have alerted a prudent fiduciary to the need to take alternative actions; and

(c)   failing to remove fiduciaries whose performance was inadequate in that they continued to imprudently allow Plan investment in artificially inflated Allergan stock.

128.   As a result of these breaches of the duty to monitor, the Plan, plaintiff and other Plan participants were damaged and sustained losses in an amount to be determined at trial.  Had the Benefits Committee not abrogated its duty to monitor, Plan participants would have avoided foreseeable damages and losses.

129.   Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), the Benefits Committee is liable to restore to the Plan all losses suffered as a result of the fiduciary breaches that resulted from its failure to properly monitor the Plan's fiduciaries and its subsequent failure to take prompt and effective action to rectify any observed fiduciary breaches.

# PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for:

A.    Determination that the instant action may be maintained as a class action under Rule 23, Federal Rules of Civil Procedure, appointing plaintiff as class representative, and determining that plaintiff's counsel satisfies the prerequisites of Rule 23(g);

B.    Declaration that defendants breached ERISA fiduciary duties owed to the Plan and its participants;

C.    An Order compelling defendants to make good to the Plan all losses to the Plan resulting from defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which defendants were unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.    An Order enjoining defendants from any further violations of their ERISA fiduciary obligations;

F.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses including the lost opportunity costs;

G.    An Order that defendants allocate the Plan's recovery to the accounts of all participants who had any portion of their account balances invested in Company stock in proportion to the accounts' losses attributable to the decline in the price of its common stock and/or the value of investment in alternative options under the Plan;

H.    Awarding the Plan and/or Plan participants rescission and/or money damages including pre-judgment interest;

1      I.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

2      J.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and

3  the common fund doctrine;

4      K.     An Order for equitable restitution and other appropriate equitable

5  monetary relief against defendants; and

6      L.      Such other and further relief the Court deems just and equitable.

7                  **DEMAND FOR JURY TRIAL**

8      Plaintiff and the Class request a jury trial for any and all Counts for which a

9  trial by jury is permitted by law.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYMENT RETIREMENT SECURITY ACT

DATED: February 14, 2017

By: _____/s/ *Ken E. Steelman*_____
    Ken E. Steelman
    David F. Brown

**CORBETT, STEELMAN & SPECTER**

Ken E. Steelman
David F. Brown

18200 Von Karman Avenue
Suite 900
Irvine, CA  92612-7156
Telephone:  (949) 553-9266
Facsimile:    (949) 553-8454
ksteelman@corbsteel.com
dbrown@corbsteel.com

*Local Counsel Plaintiff  Xie and the Putative Class*

**ZAMANSKY LLC**

Samuel E. Bonderoff (*pro hac vice* application forthcoming)
Jacob H. Zamansky (*pro hac vice* application forthcoming)
Edward H. Glenn Jr. (*pro hac vice* application forthcoming)
Justin Sauerwald (*pro hac vice* application forthcoming)

50 Broadway, Floor 32
New York, NY 10004
Telephone:  (212) 742-1414
Facsimile:    (212) 742-1177
samuel@zamansky.com

*Counsel for Plaintiff Xie and the Putative Class*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYMENT RETIREMENT SECURITY ACT